

**IT IS ORDERED as set forth below:**

**Date:  April 15, 2019**
_____

**W. Homer Drake**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | | |
|---|---|---|
| **IN THE MATTER OF:** | : | **CASE NUMBER** |
| | : | |
| BRYAN SCOTT OWENS, | : | 17-12628-WHD |
| _____: | : | |
| | : | |
| GEORGIA LOTTERY CORP., | : | ADVERSARY PROCEEDING |
| Plaintiff | : | NO. 18-1008-WHD |
| | : | |
| v. | : | |
| | : | |
| BRYAN SCOTT OWENS, | : | IN PROCEEDINGS UNDER |
| Defendant, | : | CHAPTER 7 OF THE |
| | : | BANKRUPTCY CODE |

## <u>ORDER</u>

Before the Court are the Motions for Summary Judgment, filed by

the Georgia Lottery Corporation (hereinafter the "Plaintiff" or "GLC")

and Bryan Scott Owens (hereinafter the "Debtor" or "Defendant"), in the above-styled adversary proceeding.  These cross motions for summary judgement arise in connection with the complaint filed by the GLC, seeking a determination of the dischargeability of its claim pursuant to 11 U.S.C. § 523(a)(4).[1]  This is a core proceeding, *see* 28 U.S.C. 157(b)(2)(A), (I), and (O), over which this Court has subject matter jurisdiction, *see* 28 U.S.C. § 157(a), 1334.

I. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see* Fed. R. Bankr. P.

---

[1] All further references herein to statutory sections are references to the Bankruptcy Code unless otherwise indicated.

7056. "The moving party bears the initial burden to show…, by reference to materials on file, that there are no genuine issues of material fact…." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). A fact is material if its truth or falsity will affect the outcome of the case. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). If the burden is met by the movant, it then shifts to the non-movant "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.* A court must view all of the evidence in the light most favorable to the non-movant. *Kidd v. Student Loan Xpress, Inc. (In re Kidd),* 2012 WL 1820816, *2 (Bankr. N.D. Ga. Apr. 2, 2012) (Diehl, J.).

A factual dispute must also be "genuine." A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. This requires consideration of the evidentiary standard that would be applied at trial. *Id*. Here, the burden is on the

3

Plaintiff seeking the exception to discharge to prove non-dischargeability by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 287-88 (1991). Exceptions to discharge are to be narrowly and strictly construed. *White v. White (In re White),* 550 B.R. 615, 620 (Bankr. N.D. Ga. 2016) (citing *Grogan*, 498 U.S. 279, 287-88 (1991)).

Additionally, a party seeking summary judgment must submit a statement of the uncontested facts to which the movant contends there is no genuine issue to be tried. BLR 7056-1(a)(1). The respondent is required to respond to each of the movant's statements of material fact. BLR 7056-1(a)(2). Facts not specifically controverted are deemed admitted. *Id.* However, the Court will not consider statements of issues or conclusions of law. *First Nat'l Bank of Griffin v. Wyatt-Frizzell (In re Frizzell),* 2006 WL 6589889, at *2 (Bankr. N.D. Ga. Aug. 8, 2006) (Drake, J.).

4

## II. Findings of Fact and Procedural History

Big O 10-10 d/b/a Big "O" Lotto (hereinafter "Big O") is a truck stop and convenience store.  The Defendant, on behalf of Big O, submitted a Retailer Application to the GLC for the purpose of Big O becoming a Georgia lottery retailer.  (Pl.'s Compl., Ex. A, Doc. 1).  The application lists the Defendant as the owner of Big O, and states that Big O is a sole proprietorship.  (*Id.*).

This adversary proceeding arises from the Retailer Contract (hereinafter the "Agreement"), entered into on January 26, 1995, between the Defendant, signing as the owner and sole proprietor of Big O, and the Plaintiff, wherein the Defendant agreed to sell lottery tickets, and deposit the proceeds of the sales into a dedicated bank account, by which the Plaintiff could collect the funds.  (Pl.'s Compl. Ex. C, Doc. 1).  The terms of the Agreement, inter alia, are as follows: the Agreement would remain

in effect for one (1) year, unless cancelled, suspended, renewed or terminated; the Agreement was to renew automatically unless either party delivered a written notice of termination to the other party within thirty (30) days prior to the expiration of the term; the Defendant was required to provide twenty (20) days' notice of any change of ownership of the business, and thirty (30) days' notice of termination or cancellation of the Agreement; and the Agreement was not assignable. (*Id.*). Addressing fiduciary duties, the Agreement provides that the "[Defendant] acknowledges and agrees that it has a fiduciary duty to preserve and account for Lottery proceeds collected by it and that it shall be liable for such proceeds," and "that such proceeds shall constitute a trust fund in favor of [GLC] until paid to [GLC]." (*Id.*).

On that same day, January 26, 1995, the parties entered into an addendum to the Agreement. (Pl.'s Mot. Summ. J., Ex. A, Doc. 9-4).

6

Two additional addendums to the Agreement were subsequently entered into, one on November 2, 1995, and the other on March 6, 1996. (Pl.'s Mot. Summ. J., Ex. B & C, Doc. 9-4). These addendums, signed by the Defendant as the owner of Big O, added specific online lottery games to the Agreement, but did not supplant its terms. (*Id.*).

Sometime in 1996,[2] the Defendant stopped working in the convenience store portion of Big O, which is where the lottery tickets were sold, and, instead, focused solely on the trucking aspect of Big O. (Def.'s Mem. of Law in Support of Mot. Summ. J., Doc. 11-2). It appears that the Defendant left Janet Feltrinelli (hereinafter "Feltrinelli") in charge of the convenience store aspect of Big O. The fact that Feltrinelli was not

---

[2] The Defendant fails to provide a specific time or date as to when his decision to remove himself from Big O's lottery operations occurred. The Plaintiff asserts that it was wholly unaware of this change until after it had conducted the investigation into the missing funds. Therefore, the Court assumes, based upon the Defendant's signing of the addendum on March 6, 1996, that his decision to remove himself from the lottery aspect of Big O occurred sometime after that date.

subject to the fiduciary duties imposed by the Agreement is not disputed.

Approximately two years later, on February 2, 1998, Feltrinelli submitted a Retailer Application on behalf of Big O, (Def.'s Mot. for Summ. J., Ex. B, Doc. 11-3), and signed a Retailer Contract with the Plaintiff that same day. (*Id.* at Ex. C). In these documents, Feltrinelli indicated that she was the "owner" of Big O. (*Id.*). On August 1, 1998, Feltrinelli, again indicating that she was the owner of Big O, terminated the February 2, 1998, contract, stating that the account numbers associated with this contract had not been used. (*Id.* at Ex. D). These terminated account numbers are not the same account numbers associated with the Defendant's Agreement. Further, the Defendant did not provide the GLC with any notice regarding a change of ownership of Big O or termination of the Agreement. As a result, Feltrinelli's activity had no effect on the accounts associated with the Agreement, and these accounts, as well as

8

the Agreement, remained in effect.

Later in 1999, for the accounting weeks ending on August 28th, September 4th, and September 11th, the computer terminal at Big O indicated that lottery tickets had been activated and sold, and, as a result, lottery proceeds were owed to the Plaintiff. (Pl.'s St. of Uncontested Facts, Doc. 9-1). The Plaintiff attempted to collect these funds, but was unable to do so because of insufficient funds in the account. (*Id.*). The funds owed to the Plaintiff were not deposited into the account as required by the Agreement. Upon an investigation conducted by the Plaintiff, it was discovered that the specific bank account associated with the Agreement, and from which the GLC had previously withdrawn funds, was set up in Feltrinelli's name, not the Defendant's, and had been since 1993. (Def.'s Mot. Summ. J., Ex. G., Doc. 11-3).

On December 2, 1999, the Plaintiff filed a complaint against the

9

Defendant in the Superior Court of Haralson County, and the Defendant filed his answer on January 3, 2000. (Pl.'s Mot. Summ. J., Ex. E & F, Doc. 9-4). On September 13, 2001, the Superior Court, addressing the Plaintiff's Motion for Summary Judgment and the Defendant's failure to respond thereto, entered an order granting judgment against the Defendant for $62,028.95, which includes the principal amount of $56,285.41, $5.653.54 in attorneys' fees, and $85.00 in court costs. (Pl.'s Compl. Ex. D, Doc. 1). This judgment found the Defendant liable, under O.C.G.A. § 50-27-21, *et seq.*, for failing to preserve funds held in trust for the GLC.

On December 11, 2017, the Defendant filed for relief under Chapter 7 of Title 11 of the United States Code (hereinafter the "Bankruptcy Code"), and scheduled the Plaintiff as a secured creditor with an avoidable lien. On March 9, 2018, the Plaintiff filed the instant adversary proceeding seeking a determination as to the dischargeability of its claim,

and, on August 28, 2018, filed its Motion for Summary Judgment.  The Defendant, along with his response to the Plaintiff's Motion, filed his Motion for Summary Judgment on August 29, 2018.  Both parties filed subsequent briefs and responses to the opposing motions; the final relevant filing occurred on October 5, 2018, by way of the Plaintiff's Reply in Support of its Motion for Summary Judgment.

III.  Discussion

The Plaintiff asserts that, pursuant to § 523(a)(4), it is entitled to summary judgment because the Defendant, as the owner and sole proprietor of Big O,  had a duty to preserve, account for, and deliver the lottery proceeds to the Plaintiff, and that his failure to do so constitutes defalcation.  The Defendant, on the other hand, asserts that he is entitled to summary judgment because he lacked the requisite mental state for defalcation.

11

A. Section 523(a)(4)'s Exception to Discharge

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  To establish that a debt is non-dischargeable due to defalcation, a party must demonstrate that (1) the debtor held a position as a fiduciary; (2) the claim arose while acting in a fiduciary capacity; and (3) the conduct rose to the level of a defalcation. *Caitlin Energy, Inc. v. Rachel (In re Rachel),* 527 B.R. 529, 540 (Bankr. N.D. Ga. 2015).

The first and second requirements are not at issue in this case.  The Bankruptcy Court for the Northern District of Georgia has consistently held that the Georgia Lottery Statute (hereinafter the "lottery statute") and the Agreement create an express or technical trust, as required for the application of § 523(a)(4), and, therefore, impose a fiduciary duty on an

12

officer of a Georgia Lottery Retailer to not only account for proceeds of lottery sales and preserve them for collection by the GLC, but also to exercise control and supervision over its employees selling tickets and be fully responsible and liable for their conduct as it relates to the sale of lottery tickets.   O.C.G.A. § 50-27-21(a); *Ga. Lottery Corp. v. Daniel (In re Daniel),* 225 B.R. 249, 250-52 (Bankr. N.D. Ga. 1998); *Ga. Lottery Corp. v. Farhan (In re Farhan),* 2004 Bankr. LEXIS 2267, at \*5 (Bankr. N.D. Ga. Sep. 30, 2004); *Ga. Lottery Corp. v. Ingram (In re Ingram),* 2008 Bankr. LEXIS 1036, at \*9-10 (Bankr. N.D. Ga. Feb. 29, 2008); *Ga. Lottery Corp. v. Thao Huynh,* 549 B.R. 421 (N.D. Ga. 2016); *Ga. Lottery Corp. v. Tamri (In re Tamri)*, 2017 Bankr. LEXIS 3269, at \*7-8 (Bankr. N.D. Ga. Sep. 26, 2017).  Here, there is no question that the Agreement, signed by the Defendant as the owner and sole proprietor of Big O, imposed upon him a fiduciary duty that was owed to the GLC.  The

Defendant does not dispute this fact.  (Def.'s Mem. in Support of Mot.
Summ. J., Doc. 11-2).  Further, the alleged defalcation occurred while the
Agreement was in effect, and, thus, while the Defendant owed a fiduciary
duty to the Plaintiff.

Instead, the issue in this case is the third requirement.  Specifically,
whether the required *mens rea* is present to support a finding of
defalcation under § 523(a)(4).

After *Bullock*, it is clear that a finding of "defalcation" under §
523(a)(4) does not support an exception to discharge on a "no fault" or
strict liability basis.  *Heers v. Parsons (In re Heers),* 529 B.R. 734, 741
(9th Circuit BAP 2015) (citing *Bullock v. BankChampaign*, 569 US 267
(2013)).  Mere negligence is also insufficient to show defalcation.  *Estate
of Cora v. Jahrling (In re Jahrling),* 816 F.3d 921, 926 (7th Cir. 2016).
Rather, *Bullock* dictates that defalcation can be established by showing

14

that either the Defendant intentionally acted wrongfully or that he acted with criminal recklessness. *In re Rachel,* 527 B.R. 529, 543 (Bankr. N.D. Ga. 2015) (discussing *Bullock*, 569 U.S. 267 (2013)). Here, there is no evidence to suggest, or assertions made, that the Defendant's failure to deposit the funds was intentional. Therefore, the Plaintiff must show that the Defendant acted with criminal recklessness.

Criminal recklessness is established by showing that the debtor either consciously disregarded or was willfully blind to a substantial and unjustifiable risk that his actions would breach a fiduciary duty. *In re Rachel,* 527 B.R. at 543. The substantial and unjustifiable risk the debtor must consciously disregard is the risk that his conduct might violate a fiduciary duty, rather than that of a resultant injury, loss, or harm to the beneficiary. *Cincinnati Ins. Co. v. Chidester (In re Chidester),* 524 B.R. 656, 661 (Bankr. W.D. Va. 2015). "The debtor must have been

15

subjectively aware [that] he had a fiduciary duty and [that] his actions risked breaching such a duty, or that he was willfully blind[,] meaning he was subjectively aware of the probable existence of a fact[,] but did not make any effort to determine if the fact exists." *In re Rachel,* 527 B.R. at 543. The Plaintiff may also show that the risks were so obvious that the Defendant must have recognized them, yet still went forward, acting in such a way that his conduct constituted a gross deviation from the standards of conduct expected in his fiduciary role. *Ga. Lottery Corp. v. Thao Huynh (In re Thao Huynh),* 549 B.R. 421, 426 (Bankr. N.D. Ga. 2016).

The Defendant's choice to remove himself from Big O's lottery operations, and, consequently, the resulting three (3) year absence, is the factual basis upon which both parties rely in support of their arguments. The Plaintiff submits that this removal and absence created a substantial

and unjustifiable risk of breaching a fiduciary duty, of which the Defendant was subjectively aware or willfully blind to.  Further, the Plaintiff contends that such action rises to a level of reckless behavior that justifies finding defalcation.

The Defendant, on the other hand, asserts that his absence from the business renders him incapable of having the requisite mental intent necessary for finding defalcation under § 523(a)(4).  Specifically, he maintains that he was so far removed from Big O's lottery operations that there was no subjective awareness of any risk of a breach of his fiduciary duty; that he had no real knowledge of the business during the three years; and, specifically, no knowledge of any facts surrounding the alleged defalcation.  Additionally, he maintains that *Bullock* requires that he understood and remembered the terms of the Agreement (i.e. automatic renewal, notice requirements regarding change of ownership and

termination, etc.), and that he understood that Feltrinelli's applications to the GLC were not sufficient to terminate or supersede the Agreement. Further, the Defendant contends that, due to Feltrinelli's actions, he did not believe he had a fiduciary duty, and, thus, was incapable of having the requisite mental state.

Despite the Defendant's contention to the contrary, the Court finds that *Ga. Lottery Corp. v. Thao Huynh* provides guidance as to the matter before this Court.  549 B.R. 421 (Bankr. N.D. Ga. 2016).   In *Huynh*, the debtor, a lottery retailer, removed herself from her business for a period of one month because of her pregnancy.  During that time, she left the business in the hands of her employee, an individual the debtor failed to investigate (via a background check, etc.) prior to his hiring. Subsequently, during the debtor's absence, the employee stole lottery tickets and failed to deposit lottery sale proceeds.  The court found that

18

the debtor's absence from the business, her turnover of the business to an inadequately vetted employee, and her failure to alert police or attempt to recover the proceeds constituted defalcation. The court specifically noted that the debtor left control of the business in the hands of an individual that did not owe any duty to the GLC, and, therefore, had no duty to ensure that the lottery proceeds were properly accounted for, and set aside for collection by the GLC.

The Defendant maintains that this case differs significantly from *Huynh* because Feltrinelli, unlike the employee, had a long history of involvement with the lottery aspect of Big O, and because the Defendant was absent for approximately three years, which is far longer than the debtor in *Huynh*.

The Court does not agree. Regardless of the extent of her involvement in Big O, Feltrinelli, like the employee in *Huynh*, owed no

19

duty to the GLC, and was allowed to control the lottery proceeds of Big

O.  The Defendant, given these facts, made the conscious decision to

remove himself from the lottery aspect of Big O, and place Feltrinelli in

control of the lottery sales and proceeds.   Further, the Defendant's

contention that his much longer absence, compared to that of the debtor

in *Huynh*, makes him less culpable, is illogical.  In *Huynh*, the debtor was

only absent one month; in this case, the Defendant was absent for

approximately three years.  Additionally, the debtor in *Huynh* made a

minimal effort to ensure her duties were satisfied.  She monitored her store

and employee through video surveillance, which is how she discovered

the employee's theft.  Here, contrary to the *Huynh* debtor, the Defendant

not only removed himself for a period of three years, but also there is no

evidence that the Defendant made any attempt to supervise Feltrinelli, to

provide oversight, or to establish a mechanism through which to ensure,

20

or at least attempt to ensure, that his duties were satisfied.

The Court finds little merit in the Defendant's arguments that *Bullock* requires that he actually be aware of the specific terms of the contract, or that his belief that the Agreement was terminated or superseded by Feltrinelli's actions prevents a finding of the subjective awareness that satisfies *Bullock*.  The Agreement expressly sets forth the manner through which termination or cancellation may occur.  At no time did the Defendant take any such action.  The Agreement also requires that the Defendant provide notice of a change of ownership; however, the Defendant, despite Feltrinelli's presenting herself as the owner of Big O, provided no notice regarding such a change.[3]  Given the express terms of

---

[3] It is apparent that a change in ownership in Big O never occurred, and that Feltrinelli was only a manager.  After discovering the insufficient funds, GLC dealt with the Defendant in its attempt to recover the monies owed.  Further, the Defendant, not Feltrinelli, gave the GLC permission to enter Big O's premises and remove the lottery equipment.  Furthermore, during the Superior Court proceedings, the Defendant neither claimed to have sold Big O, nor did he claim that he did not own Big O.  (Pl.'s Br. in opposition to Def.'s Mot. Summ. J., Doc. 12).

the Agreement, the Defendant should have been aware that his fiduciary duty under the Agreement was continuing, and that no termination occurred at any time. The Defendant's failure to remember the terms of the Agreement does not emancipate him from his contracted fiduciary duties. *Jaycee Atlanta Development, LLC v. Providence* Bank, 330 Ga. App. 322, 328 (2014) (one who signs a contract is presumed to know its contents); *Fore v. Parnell-Martin Cos.,* 192 Ga. App. 851, 852 (1989) ("It is the duty of contracting parties to inform themselves with reference to the subject matter about which they desire to contract; if they fail to do so[,] and a mistake is made owing to their own ignorance or failure to inform themselves, then any injury results from their own conduct." (internal citations omitted)).

Also, it is extremely important to note that the events upon which the Defendant relies regarding his belief that the Agreement, and, thus,

his fiduciary duty, was possibly terminated, occurred two years after the Defendant's decision to remove himself from the business.[4]  Therefore, the Defendant removed himself from the business long before the occurrence of any possible intervening factors.  Further, the Defendant, signing as the owner of Big O, entered into an addendum to the Agreement in the same year he removed himself from the business.  It is difficult to believe that the Defendant, having recently participated in contractual business pertaining to the Agreement, was not aware of his existing fiduciary duty when he made the decision to remove himself from the business.

Ultimately, the Court finds that the Defendant's conscious decision to withdraw from the business, despite his continuing fiduciary duty,

---

[4] The Defendant chose to remove himself from the business in 1996, sometime after executing an addendum to the Agreement that same year.  Feltrinelli's application to become a lottery retailer and the subsequent contract, which was terminated for non-use, occurred in 1998.

constitutes a gross deviation from the standard of conduct expected in his fiduciary role.  The Court, try as it might, cannot see the Defendant's actions as anything other than a complete abandonment of his fiduciary duty.  To hold otherwise would essentially allow a fiduciary to "walk away" or "wash his hands" of an existing duty, remove himself from the situation to the extent that he no longer has knowledge of any circumstances involving his duty, and, as a result, no longer be subject to that fiduciary duty.  To consciously disregard a duty in such a way is to ignore a substantial risk that a breach of such duty may occur.  The Court does not believe it is an exaggeration to find that willful ignorance of one's fiduciary duty through abandonment is a gross deviation from the expected standard of conduct.

## Conclusion

Based on the foregoing, the Plaintiff's Motion for Summary

24

Judgment is hereby **GRANTED**, and, consequently, the Defendant's Motion for Summary Judgment is **DENIED**.

The Clerk is **DIRECTED** to serve this Order on all parties, respective counsel, and the Chapter 7 trustee assigned to the Debtor's case.

**END OF DOCUMENT**